THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* FRANK PALMER, Respondent.

The provision of the Penal Code (§ 181), which prohibits a conviction "of murder or manslaughter, unless the death of the person alleged to have been killed, and the fact of killing as alleged, are each established as independent facts, the former by direct proof and the latter beyond a reasonable doubt," does not require direct proof of the identity of the victim, but only of the death. Identity is not included in the *corpus delicti*, and is left open to indirect or circumstantial evidence.

An intention to change the rule of the common law will not be presumed from doubtful statutory provisions; the presumption is that no such change was intended, unless the statute is explicit and clear in that direction.

(Argued March 2, 1888· decided April 10, 1888.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, made September 13, 1887, which reversed a judgment of the court of Oyer and Terminer of the county of Clinton, entered upon a verdict

convicting the defendant of the crime of murder in the second degree and granting a new trial.

The defendant was indicted for the murder of one Peter Bernard. A dead body was found, alleged to be that of Bernard There was no direct proof of that fact, and it was sought to be established by circumstances, among others, that articles were found on or near the body which resembled articles shown to have been the property of and in the possession of Bernard before he disappeared. One witness testified that he made for Bernard a boot taken from the foot of the dead body. A satchel was found near the body in which was an almanac, on which the name of " Bernard " was written. A witness identified it as Bernard's and testified that he had seen Bernard write, and thought the name was in his handwriting. Keys found on the body fitted the lock of the satchel. Various articles of clothing found on the body were also identified as belonging to Bernard. The body was in a decomposed and unrecognizable condition.

*R. Corbin* for appellant. Section 181 of the Penal Code, requiring the death of the person alleged to have been killed to be established by direct proof, is satisfied when the death of the person claimed to be killed is made out by direct proof; and the claim or allegation that it was a certain person that died may be made out by circumstantial proof sufficient to remove all reasonable doubt. (Best on Presumptions, 271; Willis on Cir. Ev. 164; 3 Greenl. on Ev., § 133; Wharton on Crim. Law [7th ed.], § 750; 2 F. & F. 833; 4 C. & P. 221; Best on Ev. [Wood's Notes], 788, 789, 35 Tex. 97.) The proof to be applied to the fact of death must be direct proof. *(People* v. *Ruloff,* 18 N. Y. 184, 199; 1 Park. Cr. R. 609; 3 id. 207; Wharton on Hom. 317.)

*Lucien L. Shedden* for respondent. Proof of death is not proof that it is the person alleged to be dead. There must be direct proof of the death and the identification. (*People* v. *Wilson,* 3 Park. Cr. R. 207, 442.) Section 181 of the Penal Code requires direct proof of identification. (1 Greenl. on

Ev., § 1.) Direct proof is that which is produced by direct evidence of the existence of the fact required to be proved. (1 Greenl. on Ev., § 13; 1 Bouv. Law Dic. 478; 1 Best on Ev., § 294.) Penal statutes are to be strictly construed. All statutes must have a construction according to the language employed, and, when no ambiguity exists, courts cannot correct supposed defects. (*Benton* v. *Wickwire*, 54 N. Y. 226; 3 Wharton on Cr. Law, § 12; *McClusky* v. *Cromwell*, 11 N. Y. 601.)

Finch, **J.** The prisoner was convicted of murder in the second degree, and that conviction reversed by the General Term, because there was no *direct* evidence which identified the body found as that of the person alleged to have been murdered. From that decision the People appeal.

The question is a very grave one; not merely to the prisoner, whose liberty may depend upon the issue, but to the People and the administration of public justice, for, if the law be as the General Term has declared it, a murderer may always escape, if only he shall so mutilate the body of his victim as to make identification by direct evidence impossible; or shall so effectually conceal it that discovery is delayed until decomposition has taken away the possibility of personal recognition; and it will follow that the tenderness of the Penal Code has opened a door of escape to that brutal courage which can mangle and burn the lifeless body, and has put a premium upon and offered a reward for that species of atrocity. This result is said to have been accomplished by section 181, which prohibits a conviction, " unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged, are each established as independent facts, the former by direct proof, and the latter beyond a reasonable doubt." In the first clause of this provision, the endeavor to state and describe one fact has involved the statement of another, changing a simple into a compound fact, and making it possible to apply the requirement of direct proof to the two facts of death and of identity, rather than to the one fact

of the death alone. That *some one* is dead is directly proved whenever a dead body is found. Its *identity*, as that of the person alleged to have been killed, is a further fact to be next established in the process of investigation. If it be the meaning of the Penal Code that both of these facts, identity as well as death, are to be proved by direct evidence, it establishes a new rule which never before prevailed, and of which no previous trace can anywhere be found. It has always been the rule, since the time of Lord HALE, that the *corpus delicti* should be proved by direct, or, at least, by certain and unequivocal evidence. But it never was the doctrine of the common law that, when the *corpus delicti* had been duly established, the further proof of the identity of the deceased person should be of the same direct quality and character. And this becomes quite evident from a consideration of the history and philosophy of the rule.

By the *corpus delicti*, the body or substance of the offense, has always been meant the existence of a criminal fact. Unless such a fact exists there is nothing to investigate. Until it is proved inquiry has no point upon which it can concentrate. Indeed, there is nothing to inquire about. But, when a criminal fact is discovered, its existence, for the purpose of a judicial investigation, must be established fully, completely, by the most clear and decisive evidence. For otherwise the after reasoning founded upon it and drawing its force from it will be dangerous, fallacious, and unreliable. As the weakness of the foundation is more and more intensified, while the superstructure ascends and the weight grows, so the circumstantial evidence built upon a criminal fact, not certain to have existed, becomes itself weak and indecisive, and more and more so as the suspicions expand and extend. If somebody has been murdered a motive for a murder becomes a significant fact, rendered more so when identification shows it a motive for the particular murder. But if the death is doubtful the probative force of a motive dwindles to mere suspicion. In the case of *Ruloff* v. *People* (18 N. Y.

179), the doctrine was both illustrated and applied. The death of the prisoner's infant child was not proved, but in its place was put the equivocal fact of a sudden and unexplained disappearance. The evidence might all be true and yet the child be living and not dead; and, if living, every circumstance relied upon became at once fallacious and deceptive. Such circumstances gain their probative force only upon condition that there is a criminal fact which they serve to explain.

But the *corpus delicti*, the existence of a criminal fact, may be completely established, and the need of direct proof satisfied, before the question of identity is reached. There may be direct proof of a murder, though no one knows the person of the victim. A dead body is found with the skull mashed in upon the brain, under circumstances which exclude any inference of accident or suicide. There we have direct evidence of the death and cogent and irresistible proof of the violence; the latter the cause and the former the effect; both obvious and certain, and establishing the existence of a criminal fact demanding an investigation. These facts proved, the *corpus delicti* is established, although nobody, as yet, knows, and nobody may ever know, the name or personal identity of the victim. Beyond the death and the violence remain the two inquiries to which the ascertained criminal fact gives rise; who is the slain and who the slayer; the identity of the one and the agency of the other. These may be established by circumstantial evidence which convinces the conscience of the jury, and because a basis has been furnished upon which inferences may stand and presumptions have strength.

That I have correctly stated what is meant by the *corpus delicti*, requiring direct proof, and that it never did include the identity of the victim, but left that open to indirect, or circumstantial evidence, is shown by an unbroken and unvarying concurrence of authority.

Lord Stowell said, in *Evans* v. *Evans* (1 Hag. Con. 35, 105), "if you have a criminal fact ascertained, you may then take presumptive proof to show who did it — to fix the criminal — having then an actual *corpus delicti*." In *Rex* v. *Clewes*

(4 C. & P. 221), the alleged murder was in 1806, and, in 1829 bones were found buried under a barn which the prisoner had occupied. The question submitted to the jury was, whether these bones were the remains of Hemmings, the person alleged to have been murdered. It was sought to identify the bones by a carpenter's rule and the remnant of a pair of shoes found near, and also by something remarkable about the teeth. No question of the competency of any of the evidence was at all suggested, but its sufficiency was criticised and finally left to the determination of the jury, which rendered a verdict of acquittal. In Wills on Circumstantial Evidence (p. 213), it is said that direct and positive proof of the identity of the deceased is not required, and the case of *Rex* v. *Cook* is cited, in which it appeared that a human body had been burned, but enough remained unconsumed to show that it was the body of a male adult, and its further identification was founded upon circumstances, an important part of which was the finding in the possession of the prisoner of numerous articles belonging to the deceased. In *Regina* v. *Hopkins* (8 C. & P. 591), the identity of the deceased with that of the child, alleged to have been murdered, failed, not only because of differences in the appearance of the body, but also from differences in the clothing, and the whole inquiry turned upon resemblances, or the want of them. In Best on Presumptions (vol. 2, p. 780), it is said that "every criminal charge involves two things; first, that *an* offense has been committed; and, second, that the accused is the author, or one of the authors of it;" and, the learned writer adds: "The identification of the body of the deceased need not be proved by witnesses, who, by an actual inspection of the body, recognize it as the body of the person with whose murder the prisoner is charged; but it may be by the same class of proof as is used to identify the prisoner on trial, or any other material facts. * * * Indeed, it may be said that any proof that satisfies the jury that the body is that of the deceased is sufficient; as fragments of the clothing identified as similar to that worn by the deceased when last seen alive." Starkie (p. 575) defines the *corpus delicti* as

"the fact that the crime has been actually perpetrated," and Greenleaf (vol. 3, § 131) as "the fact that a murder has been committed," and adds that the rule requires "unequivocal and certain proof that some one is dead." All these cases and authors hold, without exception, that until a criminal fact has been established, "*antequam de crimine constiterit*," there can be no basis for presumptive proof, but when, in a case of murder, that basis has been certainly supplied, the identity of the victim and the agency of the prisoner may be shown by circumstances.

So far as I have been able to discover, that rule has always been recognized and applied in this country. A few of the more remarkable cases may be studied to demonstrate its wide prevalence. In *People* v. *Wilson* (3 Park Cr. R. 199), it appeared that a dead body, with marks of violence upon it, had been washed ashore. It was alleged to have been the body of Captain Palmer for whose murder the prisoner was being tried. No direct evidence of that identity was or could be given. But the criminal fact of a death, by violence, having been fully established, the identity of the remains was proved by circumstances. Personal recognition had become impossible, and identity was established by an inference from resemblances. The height of the deceased was shown, an unusual length of face, and a widening of the end of the little finger, to which, in a general way, the body corresponded. But a more important fact was that the captain had imprinted his name upon his arm and leg, and in the same portions of the body found the skin had been cut away, except that on the leg the letter P remained visible. A brother-in-law of deceased, who had seen the body, was asked the direct question, whose body it was; but the court would not permit an answer; saying that the question was not the ordinary one of personal identity, since the body had been submerged for five months, but was one of an inference from resemblances, which the jury and not the witness must draw. The prisoner was convicted. In *Comm.* v. *Webster* (5 Cush. 295), the identification stood mainly upon a block of teeth found in the furnace where

part of the body was consumed. There was no direct recognition of the body by any one, but the circumstantial evidence was very strong. I do not see how the identification of the false teeth can be deemed direct evidence of the identity of the remains. It was a fact from which that identity could be inferred, and the inference be very strong, but the conclusion would still be an inference. If Dr. Keep, the dentist, after examining the teeth, had been asked the direct question whether the mutilated remains were those of the deceased, he could only have answered in the affirmative, as a judgment founded upon a process of reasoning. False teeth are artificial and not natural. They may be worn at one time and omitted at another. They may be lost from the mouth and pass into a stranger's possession. If their identity as found among the remains directly identified the body, why did not in the present case the proved identity of the boot found on the foot of the body discovered directly identify that body? Is not the difference rather one of the degree than of the kind of proof? But in both cases I think the evidence was inferential, and cannot justly be regarded as direct. In *Taylor* v. *The State* (35 Texas, 97), there was no direct proof of the identity of the deceased, but his clothing, hat and papers were identified, and his wagon and team and even his dog were found in the prisoner's possession. A still more remarkable case was that of *The State* v. *Williams* (7 Jones, 446), where with the bones were found some trifling articles of feminine attire, seemingly insufficient to justify an inference of identity.

In all the investigation to which the briefs of counsel have led the way, and which I have independently pursued, I have found no trace of authority for the doctrine said to be established by the Penal Code, save here and there some careless expression which seems to include the identity of the deceased in the *corpus delicti*, and which plainly originated in a tacit assumption of that identity for the purposes of the idea sought to be conveyed.

We come now to the inquiry whether the rule of the common law has in fact been changed by the Penal Code, and we

are to approach that inquiry with the presumption that no such change was intended unless the statute is explicit and clear in that direction. (1 Kent's Com. [3d ed.] p. 463; *White* v. *Wager*, 32 Barb. 250; affirmed 25 N. Y. 328.) I am persuaded that a careful analysis of the section referred to will show that no such change, so radical and dangerous, was either made or intended, and that the sole scope and purpose of the section was to declare in explicit terms the existing rule of the common law.

The language of that section contemplates two independent facts, not three nor four. It speaks of them as "each," and describes them as "the former" and "the latter.' One is to be proved by direct evidence, the other beyond a reasonable doubt · This language is appropriate and precise, if by the one fact is meant the fact of the death of the person alleged to have been killed, however that identity may be shown, and assuming it to have been established; and by the other the guilty agency of the prisoner. But the language becomes quite inappropriate if the meaning is that two facts, the death of the deceased and his identity, are to be established by direct evidence. It is the one fact that is to be thus proved. When the person supposed or alleged to be dead is identified, the fact that such person is actually dead—not merely that he has disappeared or cannot be found—that vital fact of his death must be proved by direct evidence. As the learned district attorney very aptly states it, " direct proof that somebody is dead becomes direct proof that A. B. is dead when the body is identified as that of A. B."

But the meaning and construction of the section becomes plainer when we observe that if the identity of the deceased is involved in the first fact, treated as a compound fact, and requiring direct proof, it is also embraced in the second fact which is equally a compound fact, and which may be proved by indirect evidence. The second clause reads: " The fact of the killing by the defendant *as alleged*; " not merely *a* killing, but *the* killing *as alleged*; the precise killing with which he stands charged; in the present case, not simply the killing of

somebody, but the killing *alleged*, that of Peter Bernard, the identical person, whatever his name, whose dead body has been found. The killing of that particular person is, therefore, again a compound fact made up of violence causing death, and its infliction upon the person of the alleged victim and none other than he. Under the second clause, by its explicit terms, it may be proved, by circumstantial evidence, that the prisoner killed Peter Bernard, for that is *the* killing alleged, and no other is admissible, or referred to. It would seem to follow, therefore, upon the construction asserted by the defense, that the same identification, as a limitation upon the death, must be proved by direct evidence, but as a limitation upon the killing may be proved by indirect evidence. No such confusion or contradiction was intended or effected. The requirement of the Code goes upon the assumption that the identity of the deceased, either by name or description, has been established in the ordinary way, and then requires that the death of that person, thus identified, shall be directly proved, and the killing by the prisoner of the same person shall be shown beyond a reasonable doubt. Those two facts alone are the subject of the legislation, and they are properly referred to as " each," and correctly described as the " former " and the "latter." No purpose to change the settled rule of the common law is disclosed, but simply an intent to declare it as it had long existed. The trial judge, therefore, was right, and the General Term was in error.

We have read the evidence given carefully. That the body found was that of Peter Bernard was established beyond reasonable doubt. The prisoner was a witness in his own behalf. He shows that he and Bernard were in the locality where the body was found at about the date of the latter's disappearance. His own declarations show that he had no doubt of the identity of the body found. He explains his possession of a twenty dollar bill which in some manner he got from Bernard, but the explanation is not at all probable or satisfactory. The evidence of the persons who claim to have seen the deceased after the date of the murder was probably

honest, but quite certainly mistaken.  He was a total stranger to them, and their comparison was founded on a photograph. In the case of Webster there were five persons who honestly believed that they saw Parkman alive after he had in fact been killed.  Upon the whole case we see no sufficient reason to distrust the conclusion which the jury reached.     $\mathcal{W}$

The judgment of the General Term should be reversed, and that of the Oyer and Terminer of Clinton county affirmed.

All concur, except Gray, J., dissenting.

Judgment reversed.