PEOPLE v KOZLOW

1. EVIDENCE—ADMISSIBILITY—DISCRETION.

   The admission of evidence is within the sound discretion of the trial court and the exercise of that discretion will not be disturbed unless a clear abuse is demonstrated.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 29 Am Jur 2d, Evidence § 249 *et seq.*
[3] 29 Am Jur 2d, Evidence § 787.
[4] 29 Am Jur 2d, Evidence § 530.
[5, 6] 40 Am Jur 2d, Homicide §§ 284, 285.
[7] 40 Am Jur 2d, Homicide §§ 438, 439.
[8–10] 40 Am Jur 2d, Homicide § 414.
[11] 53 Am Jur, Trial § 836 *et seq.*
[12] 53 Am Jur, Trial § 587 *et seq.*
[13, 14] 29 Am Jur 2d, Evidence § 493 *et seq.*
[15] 5 Am Jur 2d, Appeal and Error § 545.
   Consideration, in determining facts, of inadmissible hearsay evidence introduced without objection.   79 ALR2d 890.

2. EVIDENCE—ADMISSIBILITY.

Evidence is admissible, as a general rule, if it is helpful in throwing light upon any material point in issue unless its possible prejudicial effect outweighs its probative value.

3. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE—ADMISSIBILITY—BONES OF VICTIM—PHOTOGRAPH OF GRAVE SITE.

The skull and bones of the victim and photographs of the grave site from which they were recovered were properly admitted in a first-degree murder trial where the leg and foot bones aided in proving the victim's identity, the skull and pictures of the grave site corroborated testimony establishing the *corpus delicti* of the crime, the photographs were of such a poor quality that they could not be considered gruesome or inflammatory, and the skull and bones were washed and cleaned before being shown to the jury, because there was little, if any, prejudicial effect to outweigh the probative value of the evidence.

4. CRIMINAL LAW—CORPUS DELICTI—EVIDENCE—EXTRAJUDICIAL CONFESSION.

The *corpus delicti* of a crime may not be proved by a naked extrajudicial confession.

5. HOMICIDE—FIRST-DEGREE MURDER—CORPUS DELICTI.

The *corpus delicti* of the crime of first-degree murder consists only of proof of the death and the existence of a criminal agency as its cause.

6. HOMICIDE — FIRST-DEGREE MURDER — EVIDENCE — EXTRAJUDICIAL CONFESSION—ADMISSIBILITY.

Only the *corpus delicti* of first-degree murder need be proved independently to make an extrajudicial confession concerning that crime admissible.

7. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION AND MALICE—CIRCUMSTANTIAL EVIDENCE.

The elements of premeditation and malice may be inferred from circumstantial evidence once the *corpus delicti* of the crime of first-degree murder has been established.

8. EVIDENCE—WEAPONS—LAYING FOUNDATION.

A *prima facie* showing of the identity and connection with the crime is a necessary and sufficient foundation for the admission into evidence of an instrument or weapon used in the commission of the crime; clear, certain, and positive proof or positive identification is generally not required.

9. EVIDENCE—WEAPONS—LAYING FOUNDATION.

Objections to the lack of positive identification or to the suffi-
ciency of the evidence identifying an instrument or weapon
offered into evidence as the weapon used in the commission of
the crime charged go to the weight or probative force of the
evidence and not to the sufficiency of the foundation required
for admissibility.

10. EVIDENCE—WEAPONS—ADMISSIBILITY—LAYING FOUNDATION.

A proper foundation was laid for the admission into evidence
in a first-degree murder trial of a 16-gauge shotgun, offered
as the murder weapon, even though there was a discrepancy
between the testimony of a prosecution witness as to the gauge
of the shotgun used in committing the murder and the gauge
of the shotgun offered where expert testimony showed that
the deceased had died from a gunshot wound and the prosecu-
tion's witness testified that the defendant had told him that
he had procured a shotgun to use in the killing and, after
the murder, had eventually returned it to his father's house;
the discrepancy concerning the gauge of the shotgun was
before the jury and the conflicting evidence went to the
credibility of the witness and the probative force of the
evidence, not to the question of the establishment of a proper
foundation for the shotgun's admission.

11. CRIMINAL LAW—INSTRUCTIONS TO JURY—MISSTATEMENTS.

A misstatement in the instruction to the jury that a prosecu-
tion witness equivocated as to the gauge of the shotgun
used in a first-degree murder, when, in fact, the witness
positively stated that it was a gauge different than the gauge
of the shotgun offered as the murder weapon was not error
resulting in a manifest injustice where no attempt was made
to correct the misstatement at trial by a timely objection,
the issue was not raised in the defendant's motion for a new
trial, and where the court, in its instruction, three times
emphasized that the jury was the sole judge of the facts
regardless of what the court or attorneys said concerning
those facts.

12. CRIMINAL LAW—INSTRUCTIONS TO JURY—COMMENT ON EVIDENCE.

Comment by the trial judge during instructions to the jury
that the people claimed that the murder weapon was a 16-
gauge shotgun with a pitted barrel and broken stock and that
the weapon admitted into evidence was the murder weapon,

and that a question concerning the gauge of the shotgun used in the murder existed because of a discrepancy between the testimony of a prosecution witness as to the gauge and the gauge of the shotgun offered was not reversible error even though the instructions disclosed statements made by the defendant which had been ruled inadmissible where the jury knew, from a witness, that the murder weapon had been buried and then dug up, and that a 16-gauge shotgun with a pitted barrel and broken stock had been admitted into evidence, the jury was not told why or whether the police had sought a shotgun with a pitted barrel and a broken stock, the defendant proposed no objections or corrections to the instructions, and the jury had been instructed that it alone was the trier of fact.

13. EVIDENCE—HEARSAY—STATE OF MIND.

An extrajudicial utterance is admissible, so far as the hearsay rule is concerned, whenever that utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance because no assertive or testimonial use is sought to be made of that utterance.

14. EVIDENCE—HEARSAY—STATE OF MIND.

Testimony by a key prosecution witness, in explaining why he had written his brother that he would give testimony favorable to the defendant, that the brother had said that the defendant threatened him was admissible where the defense brought out the witness's letter to his brother in order to impeach the witness and the defendant's alleged threat was introduced by the prosecution's order to rehabilitate its witness, because the testimony was not used to show that a threat had been made, but to show the witness's state of mind when he wrote to his brother.

15. EVIDENCE—HEARSAY—STATE OF MIND—INSTRUCTIONS TO JURY.

Failure to instruct the jury that testimony of a witness that his brother had told him that the defendant had threatened him should be considered solely in determining the witness's mental state, the purpose for which that testimony was properly admitted, and not in determining whether the defendant actually did threaten the brother cannot be assigned as error on appeal where there was no request at trial for a limiting instruction nor a timely objection to the instructions as given (GCR 1963, 516.2).

Appeal from Arenac, Dennis J. O'Keefe, J. Submitted Division 3 October 8, 1971, at Lansing. (Docket No. 10769.)   Decided February 23, 1972. Leave to appeal denied, 387 Mich 798.

Joseph Kozlow was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Robert C. Goussy* and *John A. Wilson,* Assistants Attorney General, for the people.

*Arthur J. Tarnow,* State Appellate Defender, for defendant.

Before: QUINN, P.J., and DANHOF and TARGONSKI,* JJ.

TARGONSKI, J. Defendant, Joseph Kozlow, was tried and convicted of murder in the first-degree[1] on November 10, 1969. Defendant's application for leave to file a delayed appeal was granted by this Court January 22, 1971.

The fact of this case as developed by the prosecution at the trial on the basis of investigation by the State Police are as follows: sometime in 1968 the State Police received a tip from one Jack McKinley, a prisoner in Marquette Prison, that a crime had been committed some six years previously, the facts of which had been disclosed to him. According to this story, the defendant had related to McKinley the story of the murder and burial of one James Shannon. McKinley reported that the defendant informed him that in June 1962, while sitting behind

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA 750.316; MSA 28.548.

Shannon in Shannon's car, in a remote area of Arenac County, defendant had shot Shannon in the back of the head with a single-shot, single-barrel shotgun. Defendant and his brother, Edward Kozlow, then buried Shannon in the woods and drove the car to a river to wash the blood out. A few days later, on a visit to the grave site, defendant and his brother noticed that the grave had been disturbed by animals, so they buried the body at a different site and poured lime in the grave. Defendant also told McKinley that he had buried the shotgun somewhere on his father's farm, but when it was plowed up later he had cleaned it and taken it back into his father's house. The motive for the crime allegedly was the desire of the defendant and his brother to secure the engine from Shannon's car and the money in his wallet. They drove the car around for a few days and then removed the engine from the car and ultimately sold it to a junkyard. They endeavored to disassemble the car with an ax before burying it on the property of an old man near Twining. According to McKinley, the defendant had threatened the old man with reprisal if he said anything about the incident. Further he indicated that the old man had recently moved to Pontiac to live with his daughter. Sometime after the alleged incident relatives of Shannon inquired as to his whereabouts but the defendant claimed that he was ignorant thereof and further claimed that Shannon had disappeared owing him $5, which the relatives paid him.

For six years subsequent to the events related, until Jack McKinley revealed this story, both the crime and the victim's body remained buried. With meticulous care in a seven-month investigative effort the State Police managed to piece together the

evidence and developed the testimony substantiating the information they had received.

The State Police located 60-year-old Lawrence Ecker in Saginaw, living with his daughter. They had previously lived in Arenac County. Mr. Ecker testified that the defendant had introduced him to the deceased Shannon while the latter was still alive and that defendant had later shown him where he had buried Shannon's body. He further testified that the defendant and his brother, while in his backyard, had taken an engine from a car and that afterwards the car had been stripped down, chopped with an ax, burned, and hauled away.

One Melvin Spencer partially corroborated the testimony of Lawence Ecker. He testified that defendant had shown Mr. Ecker and himself the spot where he had buried the body. Allegedly defendant then threatened both of them with dire consequences if they dared to tell anyone. Spencer further testified that defendant had told him that it was Shannon's mistreatment of the defendant's sister that caused him to kill him.

Dennis Chrivia, a part-time deputy sheriff in 1962, testified that on June 16, 1962, he had issued a traffic ticket to defendant who had produced the license and registration of one James Shannon.

Ecker led the State Police to a place that defendant had allegedly indicated to him as the burial place of a body. Here the police found the remains of a human body, later positively identified as that of James Shannon, in a shallow grave. The skull, bearing a large hole in the rear and a fracture "not compatible with life," was taken from this grave and later introduced at trial without objection, as were the bones of a left leg and feet bearing evidence of a healed fracture matching one known to have been sustained by Shannon. Also introduced with-

out objection were seven photographs, in color, of the grave site, some of them showing traces of calcium carbonate, a substance found in lime.

A single-shot, single-barrel shotgun was discovered in the home of defendant's brother, Valentine Kozlow. This weapon was admitted into evidence at the trial over objection by the defendant.

The defense in its presentation at the trial maintained that some person other than defendant, to-wit, his uncle by marriage, had the motive, temperament, and opportunity to murder James Shannon. The uncle, referred to by the defense, had been institutionalized and had committed suicide four years prior to trial. The defendant's aunt, the wife of said uncle, testified for defendant.

Defendant raises five issues on appeal which he contends constituted error. A careful examination of such contentions follows.

I. Was it error to admit into evidence the skull and bones of the deceased and photographs of the grave site?

Defendant now objects to the admission into evidence of the skull, leg, and foot bones, and photographs of the grave site on the grounds that these items were so prejudicial to a fair trial as to require a new trial even absent objection. The admission of evidence however lies within the sound discretion of the trial court and we will not disturb such exercise of discretion unless a clear abuse is demonstrated. *People v Gill,* 31 Mich App 395 (1971); *People v Hoffman,* 24 Mich App 244 (1970); *People v Surles,* 29 Mich App 132 (1970). The general rule concerning admissibility of evidence was recently reiterated in *People v Surles, supra,* in which this Court said:

"In Michigan the general rule of admissibility seems to be 'that it is admissible if helpful in throw-

ing light upon any material point in issue.' *People* v *Becker,* 300 Mich 562, 565 (1942). This rule has been refined somewhat as stated in a thorough opinion by Judge J. H. GILLIS in *People* v *Turner, supra*[2] (p 130) as one disallowing relevant photographic evidence 'if its possible prejudicial effect outweighs its probative value.' " (Footnote added.)

In examining the instant case we find that the trial court did not abuse its discretion in allowing the skull and bones, along with pictures of the grave site, to be introduced into evidence. The leg and foot bones aided in proving the identity of the deceased although they were actually not necessary to the establishment of such identity. The skull and pictures of the grave site corroborated Jack McKinley's testimony. Together this evidence helped to establish the *corpus delicti* of the crime. In addition, because of the poor quality of the photographic exhibits, they could not be considered gruesome or inflammatory. See *People* v *Falkner,* 36 Mich App 101 (1971). The skull and bones were apparently washed and cleaned before being shown to the jury. The photographs show leaves, dirt, a whitish substance, and only indistinguishably a half-buried skeleton. Clearly, under this situation, there was little, if any, prejudicial effect to outweigh the probative value of this evidence.

II. Was it error to deny defendant's motion to quash the information as to murder of the first and second degree on the ground that no evidence existed to support a finding of premeditation other than the defendant's extrajudicial confession?

It is the defendant's contention that there was no evidence introduced at trial going to the issue of premeditation or malice save the extra-judicial con-

---

[2] 17 Mich App 123 (1969).

fession introduced through the testimony of the witness Jack McKinley. Further, defendant contends that the *corpus delicti* of first-degree murder, *including* premeditation and malice must be established by evidence independent of the defendant's extra-judicial confession in order to support the charge. We cannot fully agree. The long-established rule is that the *corpus delicti* of a crime may not be proved by a naked extrajudicial confession. *People* v *Ranney,* 153 Mich 293 (1908) ; *People* v *Eding,* 292 Mich 46 (1939) ; *People* v *Lane,* 49 Mich 340 (1882). But, it is also well established that the *corpus delicti* of the crime of first-degree murder consists only of proof of the death and the existence of a criminal agency as its cause. *People* v *Mondich,* 234 Mich 590 (1926) ; *People* v *Coapman,* 326 *Mich* 321 (1949). Thus, death and the existence of criminal agency as its cause, the *corpus delicti* of the first-degree murder, only need be proved independently to make extrajudicial confessions admissible as to the elements of premeditation and malice. *People* v *Mondich, supra.* Furthermore, once the *corpus delicti* has been established, the elements of premeditation and malice may be inferred from circumstantial evidence. *People* v *Griner,* 30 Mich App 612 (1971) ; *People* v *Crawford,* 30 Mich App 221 (1971).

In this case proofs were introduced at trial indicating that a buried skeleton had been found, the place where it was found, the condition in which it was found, that the skeleton was that of James Shannon, and that he died under conditions indicating a criminal agency as the cause of death, before Jack McKinley's testimony was introduced as the extrajudicial confession of the defendant. The *corpus delicti* of the charged homicide was sufficiently established by proofs independent of the extrajudicial confession. Inferences from such proofs, in conjunc-

tion with the extrajudicial confession, established such premeditation and malice as was necessary to support the charge of first-degree murder.

III. Was an adequate foundation laid to admit the shotgun into evidence at trial?

The prosecution introduced a 16-gauge shotgun into evidence, holding it out as the murder weapon. Defense counsel objected to its introduction on the grounds that no proper foundation had been laid for its admission. Although we find no Michigan case law directly on point, a look at 22A CJS, Criminal Law, § 712, pp 961–963 will offer guidance:

"To warrant the admission in evidence of an instrument or weapon as the one with which the crime was committed, a *prima facie* showing of identity and connection with the crime is necessary and sufficient; clear, certain, and positive proof, or positive identification, is generally not required. Objections to the lack of positive identification, or to the sufficiency of the evidence identifying the article in question or connecting it with the accused or with the crime, such as the objection that a considerable length of time elapsed after the crime before the weapon or instrument was found, or that in the interval third persons may have had access thereto, or that it was tampered with, go to the weight, or probative force, of the evidence rather than to the admissibility of the article." See also *People v Burrell,* 21 Mich App 451, 456 (1970).

Expert testimony was introduced in the instant case to establish presence of metallic fragments in the skull of the deceased, plus a large hole in the rear thereof; also, Jack McKinley testified that defendant had told him he had procured a shotgun from his father's house to use in killing the deceased. Defendant further told McKinley, according to his

testimony, that at first he had attempted to dispose of the gun by burying it on his father's property, but that it had been plowed up subsequently, so that he had taken the gun back into the father's house, and thereafter, had not attempted to dispose of it again. When asked if the defendant had told him what kind of shotgun he had used, McKinley responded: "As I recall, he told me it was a single-barrel 12-gauge". But State Police detective Robert F. Ward then testified that when he spoke with Jack McKinley the shotgun had not been identified by gauge, and that pursuant to the information obtained by his investigation of the case he had sought a single-barrel, single-shot shotgun with a pitted barrel.

The jury heard the above testimony, including Jack McKinley's description of the shotgun, as he stated on the witness stand, as a 12-gauge. Presumably, they were aware of the fact that the gun admitted into evidence was a 16-gauge shotgun. Consequently, we feel that any discrepancy between the testimony and the shotgun offered affected the credibility and not its admissibility and a proper foundation was then laid for admission of the shotgun. The members of the jury ascribed such weight as they chose, or believed proper, to the shotgun in evidence.

It should also be noted that, for the first time on appeal, defendant asserts that before the shotgun could be introduced into evidence, prosecution is required to show that it be in the exact same condition as at the time of the crime. Such an issue was never raised below, and therefore, it will not be heard on appeal. *People* v *Kennedy*, 22 Mich App 524 (1970); *People* v *Ray Clifton Smith*, 20 Mich App 243 (1969).

IV. Did the trial judge commit reversible error in his instruction to the jury by commenting on the con-

dition and character of the shotgun allegedly used by defendant, comments allegedly originating from testimony excluded from evidence?

Defendant finds fault with that part of the trial court's statement of the people's theory that follows:

"It is the claim of the people, and from information that was received from Jack McKinley, that the said James A. Shannon was shot with a shotgun. It was the testimony of Mr. McKinley that the gun that was said to have been used by the defendant was a .16 gauge [*sic*], or was a .12 gauge shotgun, and some question here now as to whether or not if a gun was used, on James A. Shannon, whether it was .12 gauge or a .16 gauge shotgun. The shotgun that was introduced here, and claimed to be the gun that was picked up at the brother, I believe, or uncle, of Mr. Kozlow, was a .16 gauge, single shot shotgun."

Defendant contends that this trial court characterization of McKinley's testimony indicates that the witness equivocated regarding the gauge of the shotgun defendant had informed him he had used. In fact, McKinley never stated that a 16-gauge shotgun was used, but testified that it was a 12-gauge shotgun. Even though we construed this as a misstatement by the trial court, no attempt to correct same was made at the trial. This issue was not even raised by an appropriate objection at trial, nor in the first motion for a new trial. Further, the trial court carefully explained to the jurors that they were the sole judges of the facts:

"Now, I want to explain to you that you are the judges of the facts; regardless of what Mr. Sperry or Mr. Maki, or myself might say to you, this is not the facts in this particular case."

The trial court re-emphasized this instruction twice more. To further emphasize this point, the

trial court made the following statement toward the end of his jury instructions:

"Your decision should be based solely upon the facts and evidence presented to you from the witness stand."

Thus, after viewing all the statements made by the trial court to the jury, any possible irregularity in the statement of the position of the prosecution was, at most, error which does not approach "manifest injustice". *People* v *McClure,* 29 Mich App 361, 369 (1971); *People* v *Doane,* 33 Mich App 579 (1971).

Defendant also finds fault with a later part of the trial court's statement of the people's theory that follows:

"It is the claim of the people in this case that the gun that they claim was used in this offense, or alleged offense, was single barrel shotgun; that it had a broken stock, and that gun was introduced here into evidence. It was pitted and it had a broken stock, the only question was whether or not it was a .12 gauge or a .16 gauge shotgun that is alleged to have been used."

Defendant contends that the trial court, in this statement, disclosed certain testimony, if not affirmatively excluded from jury consideration, then at a minimum, simply not presented before the jury at trial. It is true that the statements made to the police by the defendant were excluded by a *Walker* hearing and therefore inadmissible at trial. However, any of the admissions made in prison to Jack McKinley were admissible. The admissions testified to by the witness Jack McKinley placed before the jury the fact that the alleged murder weapon had been buried and subsequently dug up. The jury also knew that a 16-gauge shotgun, which had a pitted barrel and broken stock, was admitted as

people's exhibit #25. But the jury was never specifically informed whether or why the police sought a shotgun with a pitted barrel and a broken stock.

The defendant proposed no additions or corrections to the instructions to the jury after the trial court had concluded them. In such an instance, the test on appeal is found in *People* v *McClure, supra,* p 369:

"At the close of the charge both counsel indicated their satisfaction with the court's instructions. A review of the instructions shows that the court gave a fair statement of the position of the parties as to the facts and the law applicable thereto. The test on review of a criminal case is not whether there were some irregularities, but whether the defendant had a fair trial. *People* v *Mosley,* 338 Mich 559 (1953); *People* v *Boyles,* 11 Mich App 417 (1968). That standard also applies to a jury charge. *People* v *Wichman,* 15 Mich App 110 (1968)."

Taken as a whole, we do not feel that the trial court's instructions to the jury were at all misleading. The court's summation as to the people's contentions were not wholly accurate, but as previously mentioned, the jury was adequately instructed that it alone was the trier of the facts. Therefore, no error can be assigned on this issue.

V. Did the trial court commit reversible error by allowing certain hearsay statements before the jury; or if admissible under the state of mind exception, was it reversible error in failing to instruct the jury as to the limited use?

Defendant's final contention stems from the examination of witness Jack McKinley. Defendant, on cross-examining McKinley, attempted to impeach his testimony with a letter McKinley had written to his own brother in Jackson Prison suggesting that he

was prepared to do all he could to help the defendant. Further examination of McKinley however brought out testimony that McKinley's brother had told McKinley that he had been threatened by the defendant, who was also at Jackson Prison, in an apparent attempt to have McKinley change his story or not testify. Defendant claims that the testimony of what McKinley's brother had related to him amounted to hearsay evidence, and consequently inadmissible at trial. Defendant further claims that if the testimony was admissible as an exception to the hearsay rule, the trial court erred in failing to give a limiting instruction to the jury regarding the purpose of McKinley's testimony concerning letters received from his brother. We disagree with defendant's contentions. The controversial testimony here was admissible as an exception to the hearsay rule. The state of mind exception to the hearsay rule is stated as follows: "Whenever an utterance is offered to evidence the *state of mind* which *ensued in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned". Wigmore on Evidence, 3d ed, § 1789, p 235. The point of such testimony was not to show that defendant had actually threatened Jack McKinley's brother in Jackson Prison, but to explain why McKinley, in response, had thereafter written his brother telling him that he would change his story on the witness stand. McKinley's state of mind when he wrote the letters thus became an issue when defendant presented the letters into evidence. From this, the jurors were asked to infer a motive of pacification. Certainly, the prosecution's attempt to rehabilitate its witness was both appropriate and admissible into evidence. Defendant raised the issue and now must live with it.

See *People* v *Jones,* 293 Mich 409 (1940) ; *People* v *Freeman,* 32 Mich App 321 (1971).

The trial court in this case did not give, nor was it requested to give, a special instruction as to the limited purpose for which this testimony was to be used; nor was an objection made for the failure to include a limiting instruction. Absent such an objection, this Court has often held a defendant has waived his rights to object for the first time on appeal. GCR 1963, 516.2; *People* v *Anderson,* 13 Mich App 247 (1968) ; *People* v *Stevens,* 25 Mich App 181 (1970); *People* v *Dermartzex,* 29 Mich App 213 (1970). Further support is found in *People* v *Phillips,* 385 Mich 30 (1971). In *Phillips, supra,* the trial court had admitted photographs and a description of the appearance of the defendants, at the time of their arrest, into evidence for the purpose of showing their state of mind which the jury was entitled to consider as to the issue of intent. On appeal the Court stated:

"The fact that the trial judge did not instruct the jury that this evidence could be considered solely for that purpose [to show defendants' state of mind] was not error since there was no request for a limiting instruction."

Thus, based upon numerous authority, since defendant made no timely objection or request he may not now claim error in the instructions.

After carefully reviewing all the issues properly before this court we find no reversible error.

Affirmed.

All concurred.